**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALLIANCE HEALTHCARE SERVICES, INC., ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 11 C 3275 |
| ) | |
| ARGONAUT PRIVATE EQUITY, LLC and ) | |
| MEDICAL OUTSOURCING SERVICES, INC., ) | |
| ) | |
| Respondents. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A panel of arbitrators issued an award in favor of Alliance Healthcare Services, Inc. related to its purchase of all membership interests in Medical Outsourcing Services, LLC (MOS) from Argonaut Private Equity, LLC and Medical Outsourcing Services, Inc. (MOS Inc.). Alliance has petitioned to confirm the arbitration award against Argonaut, and Argonaut has petitioned to vacate the award. The Court has jurisdiction based on diversity of citizenship. For the reasons stated below, the Court grants Alliance's motion to confirm in part and denies it in part and denies Argonaut's motion to vacate.

### Background

Alliance provides diagnostic medical imaging services. In 2008, it purchased all of the membership interests in MOS, a company that provided mobile medical imaging. Argonaut owned seventy-five percent of MOS. MOS Inc. owned the remaining twenty-five percent. The parties to the sale executed a Membership Interest Purchase Agreement (Agreement), to memorialize the terms of the sale. The parties calculated

the price of the sale as 4.5 times MOS's earnings before interest, taxes, depreciation, and amortization (EBITDA) in 2007.

The Agreement contained a binding arbitration provision. It also provided that the sellers agreed to indemnify Alliance for, among other things, any breach of the representations and warranties the sellers made in the Agreement, provided that Alliance gave timely notice of the need for indemnification. The Agreement created an escrow account in the amount of $2,500,000 to cover future indemnification claims. The sellers were not required to indemnify Alliance for anything until the total amount owed by the sellers exceeded $200,000, and the Agreement placed a cap of $5,000,000 on the total indemnification liability the sellers could face.

After purchasing MOS, Alliance learned of billing practices that MOST had engaged in that Alliance considered illegal. As part of its imaging business, MOS used a radioactive pharmaceutical, fluorodeoxyglucose (FDG). MOS purchased the FDG from IBA Molecular North America, Inc. IBA charged MOS $475 per dose but provided substantial quantity discounts if MOS met certain monthly purchase targets. In 2007, MOS met those quantity targets every month and thus paid a price per dose of $165 in January and $160 every other month. IBA regularly sent MOS two different documents that reflected the purchase price. IBA first sent an invoice showing the full price of $475 and then sent a credit memo showing the true cost of $160 or $165. Despite the multiple documents, MOS did not pay the full price and get reimbursement later. Rather, it paid only the reduced price as reflected in the credit memo.

Many of MOS's medical scans were paid for by Medicare. Through a billing intermediary, MOS submitted the higher-amount IBA invoices to Medicare, but it never

submitted the later credit memos to Medicare.  Medicare reimbursement practices vary by state.  In Illinois and Indiana, Medicare paid MOS $380 per dose of FDG, eighty percent of the invoice price of $475.  Because MOS paid $160 or $165 for each dose, it received reimbursement more than $200 greater than what it paid for each dose.

In June 2009, after discussing its concerns about the billing practices with the sellers, Alliance chose to disclose MOS's billing practices to the United States Attorney for the Northern District of Illinois.  Argonaut and MOS Inc. did not participate in the disclosure because they did not believe that MOS's billing practices were illegal.  To date, the government has not taken any action to recoup any overpayments made to MOS.  Nor have the entities that administer Medicare reimbursement in Illinois or Indiana sought to recover money from MOS or advised that they believe MOS overcharged them.

In June 2010, Alliance commenced arbitration asserting that MOS's Medicare invoicing practices violated several of the sellers' warranties contained in the Agreement.  Among the warranties allegedly violated by MOS's practices were that it complied with all laws, it correctly billed the government and all third-party payors, it had no undisclosed claims or potential claims against it, it had no undisclosed liabilities, and the financial statements accurately reflected its financial position.  Alliance also claimed that the sellers' concealment and false representations regarding MOS's billing practices constituted fraud.  Finally, it requested a declaration that Argonaut and MOS Inc. would be liable for any future damages and expense resulting from government

attempts to recover money as a result of MOS's billing practices.[1] Argonaut asserted a counterclaim to recover the money that the Agreement required to be placed in escrow for indemnification purposes.

On December 27, 2011, a majority of the three-arbitrator panel issued an award in favor of Alliance. The panel found that, in 2007, MOS was reimbursed more than $200 extra for each dose of FDG than it had paid. The panel found that this extra money resulted in large amounts of extra income reported in MOS's financial statements. Furthermore, the panel found that MOS withheld the IBA credit memos and reported to Medicare that it paid $475 per dose, even though its agreement with IBA never obligated it to pay that much.

The panel majority acknowledged the seller's argument that MOS billing practices were lawful. It noted that "Alliance has not identified any statute, ordinance, rule, regulation, order, judgment, or decree that declares [the billing] practice unlawful." Pet. Ex. A at 7. The panel majority stated, however, that even if no specific statute or rule addressed MOS's billing practice specifically, the practice had to be illegal. The panel majority stated:

> Despite the absence of a specific statute, rule, etc. directed at [MOS's] billing practice, we cannot accept the claimed lawfulness of a practice that sought and obtained reimbursement for a product based on invoices stating an inflated price nearly triple the actual price, particularly when [MOS] kept secret the actual facts and never disclosed the true price to Medicare. No amount of ambiguity in the health care statutory and regulatory structure, or confusion among the Medicare agencies in their

---

[1] Alliance asserted three other claims in the arbitration. Two of these claims were settled by the parties, and neither party challenges the portion of arbitration award memorializing those settlements. The panel denied another claim, and Alliance does not challenge that decision.

4

> administration of the reimbursement program, could legitimize such a
> patently unfair and dishonest siphoning of money from the public fisc.

*Id.* The panel similarly discounted the fact that the government had not sought to recover any money from MOS, reasoning that the government has limited resources and cannot pursue every enforcement action.

The panel found that Argonaut and MOS Inc. had breached the representations and warranties they made in the Agreement by their failure to disclose all aspects of MOS's billing practices. The panel also found, however, that Alliance's fraud claim failed because Alliance had not presented clear and convincing evidence to establish either scienter or reliance. The panel declined to grant Alliance a declaration that the sellers would be liable for damages related to future attempts by the government to recapture overpayments. The panel determined that such a declaration was unnecessary because Alliance had preserved its rights by providing timely notice of indemnification, including for any future claims related to MOS's billing practices.

Alliance argued that its damages should be determined based on MOS overcharges in Illinois, Indiana, and Ohio. When calculating damages, however, the panel first found that Alliance had not proved that Medicare used an invoice reimbursement method in Ohio, and thus the panel declined to take into account the alleged overcharging in that state. Rather, the panel determined the amount that MOS had overcharged based only on Indiana and Illinois, both of which used an invoice reimbursement method. Considering overcharges in those two states, the panel found that MOS's 2007 EBITDA had been inflated by $657,180. This amount had consequently increased Alliance's purchase price for MOS by $2,957,310. The panel

then reduced these damages by subtracting the $200,000 indemnification threshold and some overcharges from which Alliance had benefitted, to arrive at a damages amount of $2,544,285. Under the New York law that applied to the Agreement, Alliance was also entitled to nine percent simple interest from the date of the closing of the transaction until Argonaut and MOS Inc. paid Alliance's damages.

The panel denied Argonaut's counterclaim. It determined that the damages that Alliance was entitled to recover from the escrow account exceeded the amount of money remaining in the account and that as a result, there was nothing left to release to Argonaut.

The panel also held that Alliance was the prevailing party and was entitled to attorney's fees under the Agreement. The panel awarded Alliance $1,453,268.71 for attorney's fees and expenses, and it expressly noted that this amount did not affect the $5,000,000 indemnification cap that the Agreement created and would not be used in calculating when the cap was exceeded. The panel determined that Argonaut and MOS Inc. were jointly and severally liable to Alliance but that as between the sellers, Argonaut was liable for seventy-five percent of the award and MOS Inc. was liable for twenty-five percent. Finally, the panel ordered Argonaut to reimburse Alliance for the share of the costs of arbitration that Alliance had already paid.

## Discussion

Alliance seeks to confirm the arbitration panel's award against Argonaut only, because it states that MOS Inc. is already complying with the requirements of the award. Alliance also seeks a ruling that the interest on its damages accruing after the panel's award should not apply against the indemnification cap provided for in the

6

Agreement. Argonaut seeks to vacate the panel's award with respect to its finding that Argonaut breached its representations and warranties regarding MOS's billing practices, its determination that Alliance had provided timely notice of indemnification, and its denial of Argonaut's counterclaim.

## A. The panel's determination

"When parties seek judicial review of an arbitrator's award, the role of the courts . . . is extremely limited." *United Food & Commercial Workers, Local 1546 v. Illinois-American Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009). "Factual or legal error, no matter how gross, is insufficient to support overturning an arbitration award." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008). "A reviewing court will enforce the arbitrator's award so long as it draws its essence from the contract, even if the court believes that the arbitrator misconstrued its provisions." *United Food & Commercial Workers*, 569 F.3d at 754 (internal quotation marks omitted). Courts should "not set aside an arbitral award so long as the arbitrator interpreted the parties' agreement *at all*." *Prostyakov v. Masco Corp.*, 513 F.3d 716, 723 (7th Cir. 2008) (emphasis in original). Courts must consider what the arbitrator's award says, but the arbitrator is not obliged to discuss any particular issue in detail or at all. *Affymax*, 660 F.3d at 285; *Edstrom Indus. v. Companion Life Ins. Co.*, 516 F.3d 546, 553 (7th Cir. 2008); *Halim*, 516 F.3d at 564.

The sole bases for vacating an arbitration award are contained in 9 U.S.C. § 10(a). *Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011). That subsection states:

> In any of the following cases the United States court in and for the district

> wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
> > 1) where the award was procured by corruption, fraud, or undue means;
> > 2) where there was evident partiality or corruption in the arbitrators, or either of them;
> > 3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> > 4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Argonaut contends that manifest disregard of the law may be another ground for vacating an arbitration award, noting that the Supreme Court has not decided whether manifest disregard is an appropriate reason to vacate an award. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1768 n. 3 (2010). The Seventh Circuit, however, has limited manifest disregard of the law to situations in which the arbitrator orders the parties to violate the law. *Affymax*, 660 F.3d at 284–85. To be successful, any other contention that the arbitration panel manifestly disregarded the law must involve a situation that "amounts to disregard of the contract that conveys the arbitrators' authority." *Id.* at 285. Otherwise the contention falls outside of section 10(a).

Argonaut contends that the members of the arbitration panel majority exceeded their powers because they disregarded the language of the Agreement in their award. Specifically, Argonaut contends that the panel recognized that Alliance had not presented any statute or regulation rendering MOS's billing practices illegal but

8

nonetheless found that the MOS's billing was unlawful. Argonaut claims that the panel thereby ignored the contract and "dispense[d] [its] own brand of industrial justice," which if true would be grounds for vacating the arbitration award. *Stolt-Nielsen*, 130 S. Ct. at 1767. Specifically, an arbitration panel cannot ignore the language of the contract and impose its own policy preferences. *United Food & Commercial Workers*, 569 F.3d at 756–57. Argonaut focuses in particular on the panel majority's statement that MOS's billing practices were "patently unfair and dishonest" as evidence that the panel was making a decision based on its policy preferences.

It is undisputed that if MOS's billing practices violated the law, Argonaut breached the warranties in the Agreement. The panel majority examined MOS's actions and concluded that they were unlawful. The panel majority's award indicates that the arbitrators followed the terms of the Agreement and did not impose their own preferred policy choices.

The panel found that MOS was paid for doses of FDG based on the invoices it submitted to Medicare in Illinois and Indiana. Pet. Ex. A at 16. The panel also found that MOS submitted to Medicare only the original invoices from IBA, not the later credit memos specifying the lower amount that MOS would actually pay. *Id.* at 5. MOS did not reveal to Medicare that it was actually paying much less for FDG than the invoices showed. *Id.* Although some of the invoices expressly stated that they did not account for the possibility of rebates, the panel found that the credit memos did not concern rebates but rather amounted to adjustments of the only price that MOS paid. *Id.* As a consequence, Medicare reimbursed MOS $380 for each dose of FDG, even though MOS paid only $160 or $165 per dose.

9

The panel noted that MOS's own attorneys told the company that its billing practices likely were legal only if it initially paid IBA the entire invoice price and later collected the volume discounts as rebates. *Id.* at 12. Yet MOS billed Medicare as it did even though it never paid IBA the $475 per dose listed on the invoices and even though its internal accounting listed the price as $160 or $165. *Id.* at 12–13. The panel also noted that there was evidence that MOS had structured its deal with IBA to maximize the amount it collected from Medicare. IBA supplied FDG to many other companies, but the highest invoice price paid by any of them was $250 per dose, compared to MOS's invoice price of $475. *Id.* at 4–5. MOS received a volume discount of 66.3%, while no other company received a discount greater than 38.7%, and single percentage point discounts were common for the other companies that IBA supplied. *Id.* at 5.

Using all of this evidence, particularly the evidence suggesting that MOS had deliberately manipulated the reimbursement amount it received from Medicare and concealed the true amount it was paying from Medicare, the panel majority concluded that MOS's behavior had to be illegal. *Id.* at 7. The majority reasoned that even if the Medicate statutes and regulations were ambiguous, and even if the government had not brought an enforcement action, the billing practices were illegal and would not stand up to scrutiny. *Id.* at 7–8. The members of the panel majority found that MOS's billing practices violated the law, even as they acknowledged that the law's requirements were unclear.

The panel's statement that MOS's billing practices were unfair and dishonest did not amount to application of its own standard of justice. Rather, it represented a conclusion that even if no statute specifically condemned MOS's practices, they had to

10

be illegal. In reaching this conclusion, the panel majority did, in fact, apply the contract and the law. Whether their panel's conclusion was correct is not for the Court to decide, *see Halim*, 516 F.3d at 563; that is part of what contracting parties give up when they opt for arbitration rather than litigation in court. And even if the panel majority could have explained its conclusion more fully or clearly, an arbitrator "d[oes] not exceed his power by not explaining his award in greater detail." *Id.* at 564.

Argonaut finally contends that the panel exceeded its authority by placing the burden on Argonaut to prove that MOS's billing practices were legal instead of placing the burden on Alliance to prove that they were illegal. The Agreement established that New York law applied to the contract, and if the arbitrators chose to ignore this, their award could be vacated. Pet. Ex. C at 37; *Prostyakov*, 513 F.3d at 723. The parties agree that under New York law, Alliance had the burden of proving that the representations and warranties made by Argonaut in the Agreement were false. Argonaut claims that the panel incorrectly placed the burden of proving legality on it because the panel entitled a section of the award "billing practice lawful?" and used other language that Argonaut contends placed the burden on it to prove the legality of the billing practices. Pet. Ex. A at 7.

Careful review of the entirety of the arbitrators' decision, however, makes it clear that they placed on Alliance the burden of proving a breach of the warranties. Even in the section entitled "billing practices lawful?," the panel summarized Argonaut's argument as "Alliance has not proved [the billing practice] was unlawful." *Id.* Further, the panel later concluded that "Alliance sufficiently proved Respondents' liability." *Id.* at 16. The fact that the panel never clearly stated that it was applying New York law is not

grounds for vacating the award. *Affymax*, 660 F.3d at 285; *Patrizzi & Co Auctioneers SA v. SDG Corp.*, No. 11 C 3589, 2011 WL 5077422, at *3 (N.D. Ill. Oct. 25, 2011). The Court is not required "to trudge through the award line-by-line" to find a "hint that the arbitrators did something different from what their charge required." *Affymax*, 660 F.3d at 285.

The Court confirms the arbitration award as it relates to the panel majority's holding that Argonaut breached its warranties in relation to MOS's billing practices.

**B.     Post-award interest**

Alliance also contends that the interest that has accrued since the arbitration panel's award should not apply against the $5,000,000 indemnification cap that the Agreement provides. Alliance argues that if the interest applies against the indemnification cap, Argonaut will benefit from pursuing what Alliance characterizes as meritless challenges to the award by effectively decreasing the amount still available under the cap.

The panel majority specifically found that the attorney's fees it awarded to Alliance were not covered under the indemnification cap, but it did not make any similar decision regarding interest. Pet. Ex. A at 16, 19. Argonaut states, and Alliance does not contest, that Alliance never raised before the arbitrators the issue of whether post-award interest would apply against the indemnification cap. Additionally, the section of the Agreement dealing with the indemnification cap does not address whether interest on the arbitration award applies against the cap. Pet. Ex. C at 31. Because the panel was not asked to decide this issue, and because the answer is not so clear "that there can be only one possible outcome," the Court cannot appropriately decide that interest

12

does not apply against the indemnification cap.  *Stolt-Nielsen*, 130 S. Ct. at 1770.

As the Agreement provides, any dispute about the meaning of its provisions must be resolved by arbitration.  Pet. Ex. C at 37.  Alliance provides no legal authority or language in the Agreement or award suggesting that the Court can decide, on its own, that post-award interest does not apply against the indemnification cap.

**C.     Argonaut's other arguments**

Argonaut argues that the Court should also vacate the arbitration panel's award to the extent that the panel held that Alliance had provided timely notice of indemnification and rejected Argonaut's counterclaim for release of the funds in escrow.  Argonaut's arguments, however, are premised on its assumption that the panel's decision that Argonaut breached its warranties should be vacated.  Argonaut does not contend that even if the Court confirms the panel's award as it relates to the warranties, the Court could vacate the award as it relates to the timely notice and the counterclaim.

Accordingly, because the Court confirms the arbitration award in relation to Argonaut's breach of warranties, the Court confirms the award in its finding that Alliance provided timely notice and its rejection of Argonaut's counterclaim.

**Conclusion**

For the reasons stated above, the Court grants Alliance's petition to confirm the arbitration award [docket no. 34] in part and denies it in part and denies Argonaut's petition to vacate the award [docket no. 49].  Specifically, the Court confirms the arbitration award as it is written but denies Alliance's request that it decide that post-award interest does not apply to the Agreement's indemnification cap.  The Court

directs the Clerk to enter judgment confirming the arbitration award.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 12, 2012